IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| Cary Dutton, | ) | |
| Plaintiff, | ) | C.A. # 2:03-3457-23 |
| v. | ) | **ORDER** |
| Michael Fagan, et al., | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court upon Defendants' Motion for Summary Judgment. For the reasons set forth herein, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Cary Dutton ("Dutton") alleges that, in the fall of 1999, he was recruited to leave his lucrative employment as a Senior Director with McKesson Red Line and accept a position with Defendant Paper-Pak Products, Inc. ("Paper-Pak").[1] According to Dutton, Defendant Michael Fagan ("Fagan") was principally responsible for this recruitment. At the time, Defendant Griff Hopkins ("Hopkins") was the Chief Executive Officer of Paper-Pak, Defendant Jolene Myers ("Myers") was the Chief Financial Officer of Paper-Pak, and Fagan was an officer of the company. According to Dutton, he entered into an arrangement whereby he agreed to work for Paper-Pak in South Carolina, and Paper-Pak agreed to maintain an office for Dutton in South Carolina. In order to induce Dutton to accept this arrangement, Dutton alleges that Fagan, Hopkins, and Myers each made certain representations that he relied on, including that (1) Paper- Pak was a financially strong entity, and was likely to become financially stronger,

_____

[1] Paper-Pak manufactures and markets disposable incontinence products, including Attends®. As is discussed further below, "Paper-Pak" was dissolved in the summer of 2003 and was subsequently reorganized as PaperPak Products, Inc. The "old" company is referred to throughout this Order simply as "Paper-Pak," whereas the "new" company is referred to as "New Paper-Pak."

with sound management, excellent cash flow, and a $25,000,000 Business Growth Fund, which would be available to him should he accept the position as Director of National Accounts; (2) Paper-Pak would pay him a base salary of $140,000.00 a year, (3) he would be eligible for an annual bonus of 35% of his annual base salary and a bonus of $350,000.00 for his first year of employment; (4) he would be eligible for 200,000 shares of company stock options, which were to be "booked" at $2.00 per share and would vest immediately if there was a "corporate transaction" and would also vest at 20% per year regardless; and (5) he would be paid six (6) months severance if his employment was terminated other than for "cause."[2]

In May 2000, Dutton's performance was evaluated by Fagan, who was acting as Vice President of National Accounts. Dutton received the highest possible rating and was told that his bonus would be between $150,000-$200,000, to be paid sometime in July after the end of the fiscal year. In late July 2000, Dutton met with the newly-hired CEO, Mr. Michael Brown ("Brown").[3] Brown informed Dutton that Paper-Pak would not be honoring its bonus commitment due to financial difficulties. Dutton advised Brown that he would be seeking other employment opportunities. Brown allegedly asked Dutton to continue working with Paper-Pak and induced him to do so by making assurances that he was attempting to arrange a successful sale/reorganization of the company. Dutton decided to remain with Paper-Pak.

---

[2] From the outset, the court notes that there are many factual disputes surrounding the inducements and assurances given to Dutton throughout the course of his employment with Paper-Pak. For purposes of this motion, the court is obliged to construe the facts in the light most favorable to Dutton as the non-moving party.

[3] While Dutton originally sued Michael Brown, and his brother, David Brown, the court dismissed all claims against Defendant David Brown for lack of personal jurisdiction by Order dated April 1, 2004. Accordingly, the court's references to "Brown" throughout this Order refer only to Defendant Michael Brown.

2

In September 2000, Brown provided Dutton with a written stock option plan. Dutton continued his positive performance with Paper-Pak, and was presented with the company's top sales performance award after he closed a three-year deal with Sysco Foods. In January 2001, Brown promoted Dutton to Executive Director, National Accounts Distribution. Dutton's base salary was increased by $10,000.00, and he was awarded an additional 100,000 shares of company stock options.

### A.    Paper-Pak's Sale

Sometime in 2001, Defendant Michael Brown announced the beginning of a process by which Paper-Pak would be sold. In September 2001, a reorganization of Paper-Pak occurred. Defendant John Vande Bossche ("Bossche") became Vice President of Sales Operations, Dutton became Vice President of Customer Development, and Fagan became Vice President of North American Sales. Brown continued to pursue a sale or reorganization of the company. According to Dutton, Brown assured him repeatedly that he would be offered an equity position in the new company at a very low cost and would receive a salary increase. Specifically, Brown allegedly informed Dutton that he would receive 1/2 to 1% of the new equity, an adjustment so that his salary was comparable to the salaries of Fagan and Vande Bossche.

In the summer of 2002, 3i Group PLC, a U.K. equity funding firm, expressed an interest in acquiring certain of Paper-Pak's operating assets. 3i Group led a group of investors in forming and financing Paper Pak Holdings Limited ("Paper Pak Holdings"), also a U.K. corporation, for the purpose of acquiring certain assets and liabilities of Paper-Pak. (Compl. at ¶¶ 15-17.) It was expressly contemplated that certain officials in management at Paper-Pak would be invited to purchase an equity interest in the new corporation and that Paper Pak

3

Holdings would use this capital to acquire the desired assets of Paper-Pak. (Brown Decl. at 1.)

On July 3, 2002, Vande Bossche allegedly called Dutton and told him that his equity payment would be required within a week. When Dutton advised about the documents and investor agreement, Vande Bossche responded that these had not been finalized yet. On July 5, Dutton called Brown to ask about sending payment for his equity share, and Brown told him to wait until he received the pertinent documents and agreements. Dutton maintains that he unequivocally intended to buy this equity interest that had been promised to him.

On July 17, 2002, Dutton received a draft of the Investment Agreement, which described in general terms the basic structure of the "buyout" transaction. (Compl. at ¶ 19; Brown Decl. at ¶¶ 4-5.) The draft Investment Agreement included Dutton as one of the managing officers who would be participating in the buyout and purchasing an equity interest in the new corporation. Dutton's equity share, however, was identified as 1/2 percent, while Vande Bossche and Fagan were scheduled to receive the full 1 percent. On July 19, 2002, however, Dutton was informed that he would not be included in the final version of the Investment Agreement and would not be offered an equity interest in the new corporation.[4] Brown allegedly

_____

[4] Defendants acknowledge that Dutton was considered for inclusion among the group of investing mangers and received a draft of the Investment Agreement on July 17, 2002. However, according to Defendants,

> Sometime in late Spring 2002, . . . , Fagan, Vande Bossche and another member of Old Paper Pak's senior sales leadership team, Kevin Larkin, met with Dutton in California to discuss what they perceived as issues with Dutton's performance. Among other things discussed at the meeting were Dutton's failure to complete strategic plans for obtaining business from his large national distributor customers, his need to spend more time in the field with customers, and complaints from his subordinates about his management style.

> In July 2002, as a result of Dutton's performance issues and the recognition that his position was not working in the sales structure, Brown reorganized Old

4

informed Dutton that an equity interest was being reserved for him for a later date contingent on his continued good performance.  On July 30, Dutton sought written confirmation of this promise, and the criteria which would be used to assess his performance.  Brown refused to confirm his alleged promises in writing.

### B.     Dutton's Placement on Administrative Leave

On July 29, 2002, Paper-Pak made a company-wide announcement that Dutton would be taking on the newly-created role of Vice President of Long Term National Accounts.  Two days later, on July 31, 2002, Allan R. Holmes, Esq. sent a letter on behalf of Dutton to Brown.  The letter addressed the equity in the new company, as well as the previously-promised bonuses and stock options.  David Brown, a lawyer in Florida and Michael Brown's brother, replied and advised Dutton that he was being placed on administrative leave on account of the July 31st letter.  Similarly, Vande Bossche wrote an email to Dutton in which he stated, "You will be placed on administrative leave until we get sorted out the issues raised in the communications from Gibbs & Holmes."

On September 10, 2002, Brown sent a letter to Dutton offering Dutton employment in New PaperPak as Vice President of the Long Term Care National Account, with precisely the same salary, bonus, and benefits as Dutton had been provided with the original Paper-Pak.  Upon receipt of this offer, Holmes wrote counsel for Defendants and allegedly explained that Dutton would be happy to return to work, but that it was his understanding that Dutton was not to do so until the matters at issue were resolved.  By letter dated January 7, 2002, Defendants' counsel

---

PaperPak's sales leadership team and eliminated Dutton's position [as one of the investing managers].
(Def. Mem. at 8).

5

advised that Holmes was correct in his assumption that "Dutton should not return to work at the present time . . . ." (Pl. Mem., Ex. 2).

A mediation of the matter was conducted in Charleston, South Carolina on February 13, 2003. After the mediation failed, Paper-Pak terminated Dutton's employment. Chris Braun was placed in Dutton's position of Vice President of National Accounts upon Dutton's termination.

After selling certain of its assets to Paper Pak Holdings, Paper-Pak changed its name to LVD Corp. for purposes of winding down. (Myers Decl. at ¶ 1.) The company was dissolved in June of 2003. PaperPak Products, Inc. ("New Paper-Pak") now controls certain U.S. operating assets acquired by Paper Pak Holdings in the buyout. (Brown Decl. at ¶ 1.)

Dutton filed this action in the Court of Common Pleas for Charleston County against Fagan, Hopkins, Vande Bossche, Myers, Brown, David Brown, Paper-Pak (erroneously sued as Paper Pak, Inc.), and Paper-Pak Products, Inc. ("New Paper-Pak") (erroneously sued as Paper Pak Products, Inc.), Paper Pak Holdings, and the 3i Group. Dutton alleged the following causes of action (1) breach of contract as to all Defendants ("Count One"); (2) fraud as to Defendants Fagan, Hopkins, Myers, and Paper Pak ("Count Two"); (3) breach of contract accompanied by a fraudulent act as to all Defendants except David Brown ("Count Three"); (4) violation of South Carolina Payment of Wages Act ("Payment of Wages Act") as to all Defendants except David Brown ("Count Four"); (5) public policy wrongful discharge retaliation as to all Defendants except Hopkins and Myers ("Count Five"); and (6) legal malpractice against Defendant David Brown ("Count Six"). On April 5, 2004, the court dismissed all claims against Defendant David Brown and the 3iGroup for lack of personal jurisdiction, and dismissed claims against Paper-Pak based on the alleged failure to pay a bonus in 2000 as time-barred. *See* Order of April 5, 2005

at 16-18.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327.

## ANALYSIS

Defendants first move for summary judgment on Dutton's breach of contract claims. Defendants contend that the contract claims are fatally flawed because (1) none of the individual Defendants can be liable for breach of the employment-related contracts, as liability only inheres

7

in the principal employer, Paper-Pak; (2) no binding contract existed for stock option awards in PaperPak or equity in New Paper-Pak, and Plaintiff cannot prove damages flowing from these claims; (3) any claims accruing prior to July 14, 2000 are time-barred; and (4) Dutton was an at will employee, and accordingly, his termination cannot be construed as a breach of contract.

Second, Defendants contend that Dutton's fraud claims should be dismissed because (1) many of the purported frauds occurred over three years ago and are time-barred; (2) the record is devoid of evidence that any of the allegedly fraudulent statements were false when made, or that Defendants acted with scienter in making the statements, and (3) with respect to the promise of an alleged bonus by Fagan, there is no evidence that Dutton reasonably or justifiably relied on such a promise. By logical extension, Defendants also argue that Dutton's breach of contract accompanied by a fraudulent act claim fails because he cannot establish a breach of contract in the first place, nor can he establish fraud. (Def. Mem. at 28 -29).

Third, Defendants argue that summary judgment is appropriate on Dutton's claim for retaliatory discharge because there are narrow circumstances, not present here, pursuant to which an at-will employee can establish retaliatory discharge. More specifically, Defendants contend that Dutton's wrongful discharge claim is barred because his discharge does not constitute "a violation of a clear mandate of public policy," the standard by which the wrongful discharge claims of at-will employees are judged. *See, e.g., Lawson v. South Carolina Dep't of Corr.,* 532 S.E. 2d 259, 260 (S.C. 2000).

Finally, Defendants contend that Dutton's claim under the South Carolina Payment of Wages Act fails for the same reasons the contract and fraud claims fail, and also because "the

8

options and equity to which Dutton claims entitlement are of no economic value, and, therefore, no payments could be due pursuant to those items."  (Def. Mem. at 29).  The court addresses each of Defendants' arguments in turn.

### A.     Breach of Contract - Count One

In his Response to Defendants' motion for summary judgment, Dutton claims that Defendants made, and subsequently breached, four contracts with him:[5]  (1) a contract for a bonus of no less than $150,000.00; (2) a contract for equity interest in Paper-Pak, i.e., options to purchase stock in Paper-Pak; (3) a contract for equity interest in Paper-Pak Holdings, Limited, the holdings company created for the buyout; and (4) a contract for employment with New Paper-Pak.  (Pl. Resp. at 20).

As Dutton notes, each of these employment-related contracts is a unilateral contract.  *See, e.g., Reese v. Commercial Credit Corp.,* 955 F.Supp. 567, 569 (D.S.C. 1997); *see also Small v. Springs Indus., Inc.,* 357 S.E.2d 452, 454 (S.C. 1987).  A unilateral contract is one "in which there is a promise on one side only; the consideration on the other side being executed."  *McMahan v. McMahon,* 115 S.E. 293, 294 (S.C. 1922).  "Essentially, unilateral contract analysis makes it possible for a court to find an implied contract between an employer and employee even though the elements of a contract are somewhat elusive."  *Reese,* 955 F.Supp. at 569.  The employer is the offeror, the employee handbook and/or promises made constitute the offer, and the employee accepts the offer and provides consideration by continuing to work.  *Small,* 357 S.E.2d at 454.  A unilateral contract has the following three elements: "1) a specific offer, 2)

---

[5]  Dutton's original complaint was vague as to what specific contracts he alleged Defendants breached, but it now appears that only these four alleged contracts are at issue.

9

communication of the offer to the employee, and 3) performance of job duties in reliance on the offer." *Prescott v. Farmers Tel. Coop.,* 516 S.E.2d 923, 926 (S.C. 2001).

### 1. The Propriety of the Breach of Contract Claims (Count One) Against the Individual Defendants

As a threshold matter, the individual Defendants - Fagan, Vande Bossche, Myers, and Michael Brown[6] - move for summary judgment on the basis that as corporate agents, they are not personally responsible for any alleged breach of the employment contracts, which were entered into between Dutton and the corporate entities, Paper-Pak or New Paper-Pak. As the individual Defendants note, the general rule is that if a contract is made between a party and a known agent acting within its authority on behalf of a disclosed principal, the principal alone is liable for the breach of the contract. *See Skinner & Ruddock Inc. v. London Guarantee & Accident Co.,* 124 S.E. 2d 178, 180 (S.C. 1962); *Green v. Industrial Life and Health Ins. Co.*, 18 S.E.2d 873 (S.C. 1942); *Goodale v. Page*, 75 S.E. 700 (S.C. 1912) (holding that an agent is not liable for contracts made on behalf of a disclosed principal); *see also McGee v. F.S. Royster Guano Co.,* 39 F.R.D. 578, 580 (D.S.C. 1966).

Here, while the individual Defendants may have personally made representations to Dutton regarding bonuses and equity, there is no doubt that all of these representations were made in their roles as agents of, and ultimately on behalf of, Paper-Pak and New Paper-Pak. Paper-Pak and New Paper-Pak were clearly disclosed principals, as all of the pertinent employment contracts were entered into between Dutton and Paper-Pak. For example, Dutton's

---

[6]  Plaintiff has never served Hopkins, and the court dismissed all claims against Defendant David Brown for lack of personal jurisdiction. Accordingly, these four individuals are the only remaining Defendants other than the corporate entities.

offers of employment with Paper-Pak and New Paper-Pak were made on behalf of the corporate entities, on corporate stationary.  (Def. Mem., Ex. 9 and 26).  Similarly, any offers for equity interests in the corporate entities were, even if discussed with Dutton by the individual Defendants, ultimately made by the corporations.   (Def. Mem., Ex. 15 at 1; Ex. 30). Accordingly, the individual Defendants are entitled to summary judgment on Plaintiff's breach of contract claims.[7]

### 2.        Breach of Contract by The Corporate Entities

Turning to the breach of contract claims against the corporate Defendants, Paper-Pak and New Paper-Pak first argue that Dutton cannot prevail on the majority of his breach of contract claims against them because he cannot establish the existence of the relevant contracts, nor can he demonstrate any damages flowing from the alleged breaches.  Moreover, the corporate Defendants argue that some of Dutton's contract claims are time-barred.  As a threshold matter, and as detailed more thoroughly below, while Dutton's complaint alleged breach of contract as to all Defendants, Dutton, in his Response to Defendants' First Set of Interrogatories and Response to Defendants' Motion for Summary Judgment, largely asserts that individual officers are liable for making and breaching the relevant contracts.  Although the court has addressed the

_____

[7]  It appears that Plaintiff conflates the breach of contract and Payment of Wages Act claims in his Response to Defendants' Motion for Summary Judgment.  For example, Plaintiff argues that his breach of contract claims against the individual Defendants remain viable because "employment contracts for wages . . . are enforceable against individual corporate officers as employers under the Payment of Wages Act."  (Pl. Mem. at 19).  While this may be true, it speaks only to whether Plaintiff can properly sue the corporate officers under the South Carolina Payment of Wages Act (Count Four), not whether the individual Defendants are subject to suit for breach of employment contracts between Dutton and Paper-Pak or New Paper-Pak.  Plaintiff never separately disputes Defendants' argument that the individual officers are not subject to suit on the breach of contract claims because they were operating on behalf of the principals.

question of individual liability above, because there are four specific contracts at issue and because Dutton's allegations remain unclear, the court considers the propriety of summary judgment with respect to each alleged contracts and respective defendants herein out of an abundance of caution.

### a.     The Contract to Provide a Bonus

Dutton first alleges that Defendants breached a contract to pay him a bonus of at least $150,000.  This court has already dismissed Dutton's bonus claim against Defendant Paper-Pak as time-barred.  *See* Order of April 5, 2004.  Now, however, Dutton claims that Defendant Fagan personally assured him that he would receive a $150,000 bonus, and that Defendant Brown refused to pay him this bonus.[8]  As cited above, neither of these Defendants is individually liable for Dutton's claim, as any assurances with respect to the payment of a bonus were made in their capacity as agents of, and on behalf of, Paper-Pak.[9]  Accordingly, as Defendants argue, summary

---

[8]  In his Response to Defendants' First Set of Interrogatories, Dutton answers that this claim is only asserted against Defendant Fagan, although he references actions taken by Defendant Michael Brown as well.  The court considers the claim to be asserted against both, as in any case, neither can be individually liable as detailed above.

[9]  Moreover, the court notes that Dutton was not contractually-entitled to a bonus.  Instead, as he admits, his employment contract only provided that he would be eligible for a bonus; eligibility for a bonus does not result in a contractually-based entitlement to such a bonus.  *See, e.g., Shahriary v. Teledesic, LLC,* 2003 WL 1194191, *5 (9th Cir. May 13, 2003) (affirming the district court's grant of summary judgment on a breach of contract claim when the employment agreement provided that the employee would be eligible for a bonus at the employer's discretion; "Teledesic had no obligation to award Shahriary a bonus. Its failure to do so, therefore, does not give rise to any recoverable damages."); *Cf. Fremont v. E.I. DuPont DeNemours & Co.,* 988 F.Supp. 870, 879 (E.D. Pa. 1997) (holding that eligibility for a bonus does not require actual distribution of a bonus).  Dutton appears to recognize this flaw in his reasoning, and accordingly argues that a separate contract for the provision of a bonus existed between Defendant Fagan and himself.  As explained above, Fagan is entitled to summary judgment on this claim.

judgment is appropriate on this claim.

### b.    The Contract for Options in Paper-Pak[10]

The corporate Defendants next seek summary judgment on Dutton's claim that they breached a contract to provide him with 300,000 options to purchase Paper-Pak stock.  While the corporate Defendants contend that Dutton cannot establish the existence of a contract to provide him with such options, the court disagrees.  On September 29, 2000, Paper Pak sent Dutton a letter stating that the PaperPak Stock Option Plan had "been finalized" and that he had "been awarded a grant of 200,000 options."  (Def. Mem., Ex. 29).  Shortly thereafter, on January 30, 2001, Paper-Pak wrote to Dutton to inform him that he had "been awarded an increase to 300,000 options."  (Def. Mem., Ex. 30).  There is no question that Dutton continued to work for Paper-Pak after the offers communicated to him by PaperPak, and thus plausibly relied on Paper-Pak's stock option offer as a condition of his continued performance.  Accordingly, Dutton has properly asserted a breach of contract claim with respect to his entitlement to options in Paper-Pak.  *See, e.g., Prescott,* 516 S.E.2d at 926 (noting that a unilateral contract consists of 1) a specific offer, 2) communication of the offer to the employee, and 3) performance of job duties in reliance on the offer.).

Defendants argue that no contract for stock options in Paper-Pak existed because "additional legal documents with definite terms" were to be provided to Dutton.  (Def. Mem. at

---

[10]  Defendants are correct that, to the extent Dutton attempts to assert this claim against New Paper-Pak, such a claim would not be viable because the alleged contract for options was entered only between Dutton and Paper-Pak.  However, the court does not believe this was Dutton's intent, as he clearly states that this claim is asserted against the "individual defendants and against Old Paper-Pak."  (Pl. Resp. at 22).  As discussed above, Dutton may not pursue this claim against the individual Defendants, but only against PaperPak.

14).  Essentially, Defendants' argument is that the September 2000 and January 2001 letters did not constitute formal offers because the parties did not intend for them to create legal relations. The court disagrees, as at a minimum, a genuine issue of material fact exists as to whether the parties intended to be bound by the terms outlined by the letters.  Both letters definitively announced that the Stock Option Plan had been finalized, and that Dutton had been awarded options pursuant to the Plan.  (Def. Mem., Ex. 29, 30).  Moreover, both letters announced to Dutton that Paper-Pak was "pleased to communicate your participation in the plan to you."  *Id.* Certainly these statements could constitute a sufficiently definitive offer so as to create the power of acceptance on Dutton's part, and a valid obligation to provide options on Paper-Pak's part once Dutton performed.  *See, e.g., Prescott,* 516 S.E. 2d at 926.

Finally, despite Defendants' arguments to the contrary, genuine issues of material fact preclude summary judgment on the question of whether Dutton incurred damages as a result of Defendants' alleged breach of contract.  As Dutton argues, the court cannot conclude as a matter of law that, even assuming a breach of this contract occurred, Dutton sustained no damages because Paper-Pak's stock was worthless, as it remains possible that the options had some value at the time at which they allegedly could have been exercised by Dutton.[11]

### c.     The Contract for an Equity Interest in Paper-Pak Holdings, Limited

In this claim, Dutton asserts that Defendant Michael Brown breached a contract to

---

[11]  The relevant measure of damages is the value of the stock at the time at which it should have been delivered to Dutton, in this case, in September of 2000 and January of 2001. While Defendants have produced evidence that the company was in financial trouble at this time, the court remains unsure as to at precisely what point the stock became completely valueless.

14

provide equity in PaperPak Holdings, Limited, the holdings company created for the buyout. Notably, Dutton asserts this claim only against Defendant Michael Brown. *See* Pl. Resp. to Def. First Set of Interrogatories; Def. Mem., Ex. 28. As the court has concluded that Brown is not subject to liability as an individual for representations made in his corporate capacity, Defendant Brown is entitled to summary judgment on this claim. *See, e.g., Goodale*, 75 S.E. at 702(holding that an agent is not liable for contracts made on behalf of a disclosed principal). This is particularly true with respect to the alleged contract to provide an equity interest in Paper-Pak Holdings, Ltd., as Paper-Pak Holdings, Ltd. was the issuer of the stock,[12] and 3i had final authority over the individuals who would be invited to participate in the transaction. (Brown Dep. at 59-61) (stating that at the time Dutton asked for equity, "no one had a final allocation of shares at all, and 3i had not approved any final allocation of shares" and that he could not have granted Dutton shares had he wanted to do so).[13]

---

[12] Dutton never served PaperPak Holdings, and accordingly, that entity is not a defendant in these proceedings. Dutton does not contend that PaperPak Holdings is a party to this breach of contract claim. (Def. Mem., Ex. 28).

[13] Even if Brown could be liable on this claim, there are several bases for finding no contract for equity in Paper-Pak Holdings existed. First, unlike the contract for options in Paper-Pak, the PaperPak Holdings Investment Agreement was clearly a draft, and never stated that it had been finalized. (Def. Mem., Ex. 16; Ex. 18). Accordingly, there was no final offer. *See, e.g., Prescott,* 516 S.E. 2d at 926. Additionally, it does not appear that, even assuming this draft could have constituted an offer, Dutton accepted that offer. It is undisputed that Dutton never paid the amounts required to purchase his equity under the draft Agreement. Just two days after receiving the draft agreement, Dutton was informed that he would not be considered for equity investment. This effectively revoked the earlier offer, assuming it existed to begin with. *See, e.g., Shirer v. O.W.S. & Assocs., Inc.,* 169 S.E. 2d 621, 622 (S.C. 1969).
   Moreover, because, as Dutton argues, the contract for an equity interest was a unilateral contract, Defendants were free to make prospective changes to the terms of that agreement. *See, e.g., Wadford v. Hartford Fire Ins. Co.*, 1988 WL 492127, *4 (D.S.C. Aug. 11, 1988) ("If the employment contract is a unilateral contract, i.e., an exchange of performance for a promise, the employer is free to make *prospective* changes in the wages, benefits, and policies that constitute

### d.     Breach of Contract of Employment with New Paper-Pak

Dutton's last breach of contract claim alleges that Defendants Michael Brown and New Paper-Pak breached a contract to provide him employment with New Paper-Pak. Dutton does not, however, dispute that his employment with New Paper-Pak was at-will. (Pl. Resp. at 23). Termination of at-will employment does not give rise to a breach of contract claim. *See, e.g., Prescott,* 516 S.E. 2d at 925 ("[T]ermination of an at-will employee normally does not give rise to a cause of action for breach of contract."). The entirety of Dutton's argument against summary judgment on this claim is that "[e]ven if the employment offered at New PaperPak is 'at will[,]' the unlawful failure to employ the plaintiff and pay the wages promised by the New PaperPak violates the S.C. Payment of Wages Act and the defendants Fagan, Vande Bossche, Michael Brown, and New PaperPak are liable for this violation as 'employers.'" (Pl. Resp. at 23). Quite obviously, this argument provides no explanation as to why Dutton's breach of contract action should survive under the rule that no breach of contract arises from termination of at-will employment, and accordingly, summary judgment is appropriate.[14]

### B.     Fraud (Count Two)

Defendants Fagan, Myers, and Paper-Pak move for summary judgment on Dutton's fraud claims on a number of bases. Before addressing the merits of any arguments, however, the court notes that Dutton has conceded that he will not pursue his fraud claims except as to Defendant

---

its offer to the employee for services the employee will perform in the future.").

[14] To the extent that Dutton intends to pursue a Payment of Wages Act claim for the termination of his employment with New PaperPak, the court addresses the merits of such a claim *infra* in Section D of this Order.

16

Fagan.[15]  With respect to this remaining fraud claim, Dutton alleges that Fagan fraudulently represented to Dutton that he would be paid his $150,000 performance bonus to induce him to remain with Paper-Pak, all the while knowing of "the colossal financial failure of Old PaperPak."  (Pl. Mem. at 26).

A party asserting a claim for fraud in the inducement to enter into a contract must establish: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.  *Brown v. Stewart,* 557 S.E.2d 676, 680 (S.C. Ct. App.2001).  A failure to prove any of these elements is fatal to recovery. *Id.*  Additionally, "[f]raud cannot be presumed; it must be proved by clear, cogent, and convincing evidence." *Foxfire Village, Inc. v. Black & Veatch, Inc.,* 404 S.E.2d 912, 917 (S.C. Ct. App.1991).

Here, while Dutton alleges that Fagan made a false, material misrepresentation that Dutton would receive the performance bonus with at least a reckless disregard for the truth or falsity of this assurance, Dutton has wholeheartedly failed to satisfy his burden of proof on the remaining elements of his fraud claim.[16]  Dutton merely argues that "[t]he remaining elements

_____

[15]  This is because, according to Dutton, "discovery has revealed that gross misjudgment, rather than purposeful fraud, led the defendants Hopkins, Myers, Fagan, and Old PaperPak to misrepresent the financial condition of Old Paper Pak at the inception of Plaintiff's employment."  (Pl. Mem. at 25-26).

[16]  As a threshold matter, Dutton cannot establish that the alleged statements were fraudulent.  In *Winburn v. Ins. Co. of North America*, 339 S.E.2d 142, 145 (S.C. Ct. App. 1985), the South Carolina Court of Appeals held that:

To establish fraud, there must first be a false representation. The false

17

of common law fraud are self-evident" and that "for the sake of brevity, [he] will not recite

them." (Pl. Resp. at 26). Notably, Dutton never points to any evidence in the record to suggest

that Fagan intended him to rely on the representations, that he did actually rely on the truth of

Fagan's representations, or that he was injured as a result of his reliance.[17] Federal Rule of Civil

Procedure 56 (e) requires Dutton, as the nonmoving party, to go beyond the "mere allegations

or denials" of the pleadings and by his own affidavit, or by the "depositions, answers to

interrogatories and admissions on file, designate specific facts showing there is a genuine issue

for trial." *Celotex*, 47 7 U.S. at 324 (quoting Fed. R. Civ. P. 56 (e)); *see also Mitchell, Best &*

*Visnic, Inc. v. Travelers Property*, 35 Fed. Appx. 75 (4th Cir. 2002) (citing *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[S]ufficient evidence (pertinent

to the material issue) *must be identified by reference* to an affidavit, a deposition transcript or

a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d

1022, 1024 (10th Cir. 1992) (emphasis added). In the absence of such specific references, the

---

representation, however, must be one of fact as distinguished from the mere expression of an opinion. As a general rule, fraud cannot be predicated on a statement that constitutes an expression of an intention.

Here, Dutton has failed to point to any evidence that Fagan's statements were anything more than an honest expression of an intention. *See also Brown v. Stewart*, 557 S.E.2d 676, 681 (S.C. Ct. App. 2001) (holding that "fraud requires the conveyance of a known falsity").

[17] Moreover, as Defendants point out, Dutton was under an obligation to "use reasonable prudence and diligence under the circumstances in identifying the truth with respect to the representations made to him." *Regions Bank v. Schmauch,* 582 S.E. 2d 432, 445 (S.C. 2003); *see also Thomas v. Am. Workmen,* 12 S.E. 2d 886, 888 (S.C. 1941) (holding that a plaintiff cannot prevail on a fraud claim unless he has employed "reasonable diligence for his own protection."). The court notes that Dutton was a mature and well-educated businessman who served at a high level within Paper-Pak, as Director of National Accounts, Distribution. Accordingly, Dutton's fraud claim might also fail because he did not use reasonable prudence and diligence in discovering the truth of certain representations allegedly made to him.

court will "not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Id.* at 1025. Importantly, this District has promulgated Local Rule 7.05(5) which expressly defines the degree of specificity which the court expects: "[w]here the memorandum opposes a motion for summary judgment, a concise statement of the material facts in dispute shall be set forth *with reference to the location in the record*." D.S.C. Loc. R. Civ. P. 7.05(5) (emphasis added).[18] Because Dutton has not proffered sufficient evidence to support his remaining fraud claim against Fagan, Fagan is entitled to judgment as a matter of law on this claim.[19]

### C.    Breach of Contract Accompanied by a Fraudulent Act (Count Three)

Defendants next move for summary judgment on Dutton's claim for breach of contract accompanied by a fraudulent act. First, as none of the individual Defendants are parties to any alleged contracts with Dutton, none of them are liable on this claim. *See Holden,* 321 S.E. 2d at 193-94.

Thus, the only remaining breach of contract claim is the alleged contract to provide options in PaperPak. In order to establish a claim for breach of contract accompanied by a fraudulent act, the plaintiff must establish three elements: (1) breach of contract; (2) fraudulent

---

[18] Additionally, a plaintiff alleging fraud must establish fraud by clear and convincing evidence. Here, as Dutton has not offered any evidence on the majority of the elements of his fraud claim, he falls woefully short of this standard. *See, e.g., Osborn v. University Med. Assoc. Of the University of The Medical University of South Carolina*, 278 F.Supp. 2d 720, 734 (D.S.C. 2003) ("Such a showing not only fails to establish any inference of fraud under a preponderance of the evidence standard, but it falls dreadfully short under the appropriate standard of proof for establishing fraud, that of clear and convincing evidence.").

[19] The court need not address the argument that this claim is time-barred, as it fails as a matter of law for the reasons stated above.

intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres, J.C.,*, 560 S.E.2d 606, 612 (S.C. 2002). With regard to the third element of this claim, the standard of proof of clear and convincing evidence is applicable. As the Honorable Judge Norton of this District has noted, when considering fraudulent intent as it relates to the breaching of a contract, however, courts are given fairly wide discretion in determining its existence:

> The fraudulent act is any act characterized by dishonesty in fact or unfair dealing. Fraud, in this sense, assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.

*See Osborn v. University Med. Assoc. Of the University of The Medical University of South Carolina*, 278 F.Supp. 2d 720, 740 (D.S.C. 2003) (internal citations omitted). "Such a standard is, to say the least, amorphous." *Id.* Indeed, this broad language has moved the Fourth Circuit to observe that, "[i]n most cases, the courts have affirmed submission of [breach of contract accompanied by a fraudulent act] claims to the jury . . . ." *Edens v. Goodyear Tire & Rubber Co.,* 858 F.2d 198, 201 (4th Cir.1988). Accordingly, because the circumstances surrounding PaperPak's provision of options to Dutton are somewhat murky, the court, construing the facts in the light most favorable to Dutton as it must for purposes of summary judgment, finds that summary judgment is inappropriate on this claim. As Dutton contends, a rational trier of fact could find that PaperPak "actively represented to the plaintiff that he had been granted stock options, but purposely failed to create the documents transferring those options." (Pl. Resp. at 25). Accordingly, summary judgment is denied on this claim.

D.    **Retaliatory Discharge**

20

Defendants next argue that they are entitled to summary judgment on Dutton's claim for retaliatory discharge in violation of a clear mandate of public policy (Count Five). Defendants contend that under South Carolina law, an at-will employee can only assert a claim for retaliatory discharge in violation of public policy in two narrow circumstances - where the employer requires an employee to violate the law or the termination itself violates criminal law. *See, e.g., Ludwick v. This Minute of Carolina, Inc.,* 337 S.E. 2d 213 (S.C. 1985); *Lawson v. South Carolina Dep't of Corrections,* 532 S.E. 2d 259, 260-261 (S.C. 2000). According to Defendants, neither of these circumstances is applicable here. Dutton, however, argues that the situations in which an employee may assert a claim for retaliatory discharge in violation of public policy are not as narrow as Defendants suggest, and that his claim remains appropriate in light of recent decisions by South Carolina courts.

South Carolina recognizes the doctrine of employment at-will. *See Shealy v. Fowler,* 188 S.E. 499 (S.C. 1936). Pursuant to this doctrine, employment for an indefinite term is terminable by either the employee or the employer for any reason or for no reason without incurring liability for wrongful discharge.[20] *See Culler v. Blue Ridge Elec. Coop.*, 422 S.E.2d 91, 92 (S.C. 1992); *Hudson v. Zenith Engraving Co.,* 259 S.E.2d 812, 813 (S.C. 1979). As both parties note, however, under South Carolina law, "where the retaliatory discharge of an at-will employee constitutes a violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." *Ludwick*, 337 S.E.2d at 216.[21]

---

[20] Dutton does not contest that he served as an at-will employee.

[21] Dutton does not argue that the other exception to the at-will employment doctrine - that an employee may have a cause of action for wrongful discharge where his or her at-will status has been altered by the promulgation of an employee handbook - applies here. *See,*

21

While this so-called "public policy" exception to the general rules governing at-will employment has been primarily applied to the two situations mentioned above (where an employer requires an employee to violate a criminal law, and where the reason for the employee's termination was itself a violation of criminal law), as Dutton argues, the public policy exception "has never been limited to such situations." *See Antley v. Sheperd,* 532 S.E. 2d 294, 297 (S.C. Ct. App. 2000). In fact, contrary to Defendants' position, the South Carolina Supreme Court has expressly acknowledged that the public policy exception may apply to a broader array of retaliatory discharge situations than the two referenced above:

> In dismissing appellant's complaint in this case, the trial judge, relying on the above line of cases, held that the public policy exception to the employment at-will doctrine was limited to: (1) situations where an employer requires an employee to violate a criminal law as a condition of retaining employment; and (2) situations where the reason for the employee's termination was itself a violation of the criminal law. Finding that the factual assertions in appellant's complaint did not fall under (1) or (2), the trial judge concluded the complaint failed to state a claim under the public policy exception to the employment at-will doctrine. This was error.
>
> While we have applied the public policy exception to situations where an employer requires an employee to violate a criminal law, and situations where the reason for an employee's termination was itself a violation of the criminal law, we have never held the exception is *limited* to these situations.

*Garner v. Morrison Knudsen Corp.,* 456 S.E.2d 907, 909 (S.C. 1995) (emphasis in original). The question then becomes whether the present allegations - that Dutton was fired in retaliation for his counsel's letter informing Defendants that Dutton was considering filing an action pursuant to the South Carolina Payment of Wages Act to recover bonuses, stock options, and equity -

_____

*e.g., Small v. Springs Industries, Inc.,* 357 S.E.2d 452 (1987).

sufficiently demonstrates retaliation in violation of a clear mandate of public policy.  In *Keiger v. Citgo, Coastal Petroleum, Inc.*, the South Carolina Court of Appeals addressed precisely this question:

> We hold the issue in the present case, whether an employer's retaliatory discharge of an employee who threatens to invoke her rights under the Payment of Wages Act is a violation of a clear mandate of public policy, is likewise a novel issue. . . . Whether the statute itself, which was designed to protect working people and assist them in collecting wrongfully withheld compensation, constitutes a legislative declaration of public policy has never been addressed by the courts of this state.

482 S.E.2d 792, 794 (S.C. Ct. App. 1997) (internal citations omitted).  While no South Carolina court has provided a more definitive answer since *Keiger*, the court believes that Dutton is entitled to proceed to trial on this claim for a number of reasons.

First, South Carolina courts have allowed plaintiffs to pursue wrongful discharge claims in situations highly analogous to Dutton's.  The South Carolina Court of Appeals' decision in *Evans v. Taylor Made Sandwich Co.*, 522 S.E. 2d 350 (S.C. Ct. App. 1999) is instructive.  In *Evans,* the plaintiffs, who were employed to make sandwiches by the defendant, were fired after filing a wage complaint with the South Carolina Department of Labor.  The plaintiff's complaint to the Department of Labor was that they had not been paid appropriate wages under the South Carolina Payment of Wages Act, just as Dutton's complaint to his superiors was in the matter *sub judice*.  In *Evans,* the question was whether the firing of the plaintiffs immediately after they notified the Department of Labor of their Payment of Wages Act complaint constituted wrongful discharge in clear violation of public policy.  Here, quite similarly, the issue is whether Dutton can sue for wrongful discharge for his firing shortly after he provided notification that he was contemplating filing a lawsuit pursuant to the Payment of Wages Act.

23

While it is true that the procedural posture of the complaints made to the employers in *Evans* and in the present matter are somewhat different, the court believes this distinction is of no import in deciding the larger issue - whether the firing of an employee after that employee attempts to invoke his Payment of Wage Act rights constitutes wrongful discharge in violation of a clear mandate of public policy. In the court's opinion, *Evans* stands for the broad proposition that discharge after an employee has attempted to invoke his right to relief, in whatever form (i.e., by filing a complaint with the Department of Labor, or by more directly notifying his employer that he intends to sue for recovery), under the Payment of Wages Act can constitute retaliatory discharge in violation of a clear mandate of public policy. The underlying premise to be derived from *Evans* is that employers should not be allowed to fire employees who seek to invoke their statutorily protected rights. *Cf. Evans,* 522 S.E. 2d at 354 ("Having determined that the terminations were in fact retaliatory, the jury then obviously determined that discharging an employee on those grounds is, and should be, a violation of the public policy of this State.").

Second, *Keiger*, 482 S.E. 2d at 794, while noting the paucity of authority on the question, provides indirect support for the court's reasoning. In *Keiger,* the South Carolina Court of Appeals reversed the trial court's dismissal of the plaintiff Sonya Keiger's ("Keiger") wrongful discharge claim on 12(b)(6) grounds. Keiger's employer had reduced her wages, and she called the South Carolina Department of Labor for information. Subsequently, Keiger informed her employer that she had learned from the Department of Labor that her wage reduction was unlawful, and that she would file a complaint if her employer did not remedy the situation. Keiger was fired shortly thereafter.

The South Carolina Court of Appeals found the trial court's dismissal of Keiger's claim premature because the South Carolina Supreme Court had "[r]ecently . . . opened the door for further public policy exceptions to the at-will employment doctrine." *Id.* The Court of Appeals's failure to hold that no viable cause of action exists for claims based on the Payment of Wages Act is instructive. While Defendants attempt to distinguish *Keiger* and *Evans* on the basis that, in both, the employee contacted the Department of Labor,[22] the court finds this an insignificant factor in deciding whether retaliation in violation of a clear mandate of public policy has occurred. After all, the "clear mandate of public policy" is not retaliation in response to a Department of Labor investigation, but rather, retaliation in response to an attempt to exercise statutorily-protected rights designed to "protect working people and assist them in collecting wrongfully withheld compensation." *Keiger,* 482 S.E. 2d at 794, *quoting Dumas v. InfoSafe Corp.,* 463 S.E. 2d 641, 645 (S.C. Ct. App. 1995). Moreover, in *Keiger,* the plaintiff had not filed a complaint with the Department of Labor, but had merely called for information, and subsequently threatened her employer with the potential future filing of an administrative claim. There is no appreciable difference in Keiger's conduct and Dutton's here, where he also threatened his employer with the subsequent filing of legal action but no Department of Labor

---

[22] According to Defendants, the public policy exception is limited to the two situations described above (where the employer requires an employee to violate the law or the termination itself violates criminal law), and "[a]pplication of the exception beyond those two circumstances has been strictly limited to instances where the plaintiff contacted a state regulatory authority concerning a statutory violation or filed a formal complaint with the appropriate government body." (Def. Mem. at 26). As discussed above, the court does not find this argument persuasive.

investigation had ensued.[23]

Finally, summary judgment on this claim is inappropriate because the South Carolina Supreme Court has held that, generally, determining whether an employer's discharge violates public policy is a factual question for the jury. *See Garner*, 456 S.E.2d at 908-10; *Cf. Evans*, 522 S.E. 2d at 353 (noting that "[f]irst, the jury had to determine whether Taylor Made terminated Evans and Eagleton because they had filed a wage complaint with the Department. If the jury concluded the termination was for that reason and was therefore a retaliatory discharge, then they were to determine if such a retaliatory discharge violated public policy."). Here, Dutton has presented sufficient evidence to support an inference that he was discharged in retaliation for his letter threatening suit under the Payment of Wages Act.

Dutton was placed on immediate administrative leave on August 2, 2002, just two days

---

[23] Defendants also argue that *Lawson*, 532 S.E. 2d at 260, is controlling, and holds that a retaliatory discharge claim cannot be based on the mere filing of an internal complaint. (Def. Reply at 7). This greatly overstates the holding of *Lawson,* which is distinguishable for several reasons. First, the employee in Lawson did not register a complaint based on a South Carolina statute, such as the Payment of Wages Act, that could constitute a clear expression of the state's public policy. *Cf. Keiger*, 482 S.E. 2d at 794 ("whether the statute itself, which was designed to protect working people and assist them in collecting wrongfully withheld compensation constitutes a legislative declaration of public policy has never been addressed by the courts of this state."). Rather, the employee in *Lawson* wrote a memo to a supervisor outlining his concerns in the selection process of another employee for a Records Manager position within the Department. *Id.*

Moreover, the Court of Appeals principally denied Lawson's claim because he had a substantive remedy for his wrongful discharge claim under the South Carolina Whistleblower statute. 532 S.E. 2d at 261. Here, in contrast, Dutton does not have a substantive remedy for wrongful discharge under the Payment of Wages Act, but instead, can only recover any wages he is entitled to pursuant to this cause of action.

Finally, the Supreme Court in *Lawson* cites approvingly to their prior decision in *Garner*, in which the court "opened the door for further public policy exceptions to the at-will employment doctrine." *Keiger,* 482 S.E. 2d at 794; *see also Garner,* 456 S.E. 2d at 909.

after his counsel's letter referencing the possibility of filing a Payment of Wages Act claim.  (Pl.

Mem., Ex. 1).  On August 5, 2002, Dutton received a letter from Vande Bossche confirming that

he was to remain "on administrative leave until we get sorted out the issues raised in the

communications from Gibbs & Holmes."  (Def. Mem., Ex. 23).  Christopher Braun, another

Paper-Pak employee, was placed in Dutton's position.  As a result of the 3i buyout, Dutton was

terminated from Paper-Pak (as were all employees).  While Dutton was subsequently offered

employment with New Paper-Pak, when he communicated his desire to return to work through

his counsel, he was told by counsel for Defendants on January 7, 2003 that he "should not return

to work at the present time."  (Pl. Mem., Ex. 2).  Moreover, Defendant Brown clearly testified

that he did not recommend Dutton for future employment (Brown Dep. at 80), and questions

remain as to whether the offer letter Dutton received for employment with New Paper-Pak truly

communicated such an offer.  For example, Brown explains that everyone received letters

similar to Dutton's when the buyout occurred as a formality.  (Brown Dep. at 54-55).  Moreover,

when Dutton was ultimately terminated in March of 2003 (and after an unsuccessful mediation

of the present litigation),  Paper-Pak's Director of Human Resources explained as follows:

> In July of last year, you were informed that your position at Paper-Pak Products,
> Inc., had been eliminated.  While consideration was given to assigning you to
> another position, *by August of 2002* it had become clear that there was no
> ongoing role for you to play in the new company.[24]  Since that time, as an

---

[24]  As Dutton notes, it appears that Defendants had made the decision with respect to his
continued employment with Paper-Pak or New Paper-Pak immediately upon his placement on
administrative leave.  Also as Dutton points out, this admission is highly contradictory to
Defendants' present assertion that New Paper-Pak ultimately determined that there was no place
for Dutton "after another employee successfully absorbed Dutton's responsibilities during his
administrative leave."  (Def. Mem. at 28; Ex. 20).  Additionally, Braun was apparently not
officially named as the successor to Dutton's position until July 8, 2003, more than four months
after Dutton received the termination letter.

accommodation, the new company has continued to pay you even though you have not performed any services in exchange for those payments.

At this point, it is not entirely clear whether you are an employee of the new company or the old company. In any event, we are terminating your employment effective March 9, 2003.

(Def. Mem. Ex. 27)(emphasis added). In short, given all of the conflicting factual inferences that can be drawn from these events, it is for the jury to decide whether Defendants Brown, Paper-Pak, or New PaperPak terminated Dutton because he threatened to file a Payment of Wages Act lawsuit, and ultimately whether, assuming Dutton was discharged in retaliation for his July letter, that discharge would violate a clear mandate of public policy. *See Garner*, 456 S.E.2d at 908-10; *Cf. Evans*, 522 S.E. 2d at 353. Accordingly, Defendants Brown, Paper-Pak, and New PaperPak are not entitled to summary judgment on Dutton's wrongful discharge/retaliation claim.[25]

---

[25] Defendants contend that at a minimum, the court should grant summary judgment to Fagan and Vande Bossche on this claim, as neither were in a position or had the authority to terminate Dutton, and neither participated in New Paper-Pak's decision to do so. (Fagan Tr. at 136; Vande Bossche Tr. at 129-30). The court agrees. Dutton has not presented any evidence whatsoever with respect to these individuals' participation in the events leading up to his termination, but only suggests that an inference to that effect may be drawn. (Pl. Resp. at 19). Fagan and VandeBossche are thus entitled to summary judgment on this claim.

Because wrongful discharge is a tort, and individual officers may be liable for torts in which they participate, direct, or authorize, *see, e.g. Hunt v. Rabon,* 272 S.E. 2d 643, 644 (S.C. 1980), Brown remains subject to individual liability on this claim. Accordingly, the claim survives summary judgment as to Brown, PaperPak, and New PaperPak.

**E.        South Carolina Payment of Wages Act**[26]

Finally, Defendants argue that summary judgment is appropriate on Dutton's claim for wages pursuant to the Payment of Wages Act, S.C. Code Ann. § 41-10-10 *et seq.*  In this claim, Dutton alleges that he is entitled to "equity in [New Paper-Pak], previously promised bonuses, and stock options."  (Compl. ¶ 21; Pl. Mem. at 8).  Defendants do not dispute that equity interests, alleged bonuses, and stock options may constitute wages under the Act.  *See, e.g., Osborn,* 278 F.Supp. 2d at 742 (acknowledging that alleged bonuses and equity interests could be wages for purposes of the Act).  Instead, Defendants contend that Dutton's Payment of Wages Act claim fails because (1) the individual Defendants cannot be liable on this count absent evidence that they knowingly permitted PaperPak to violate the Act; (2) Dutton was never entitled to a bonus, he was only bonus-eligible, and (3) the equity interests and stock options are of no economic value, and therefore "no payments could be due pursuant to those items."  (Def. Mem. at 29-30).

Pursuant to the Payment of Wages Act, the term "wages" is defined as:

all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract.  Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.

S.C. Code Ann. § 41-10-10(2).  Corporate officers may face liability under the Payment of Wages Act if they knowingly permit the corporation to violate the Act.  *See Dumas v. InfoSafe*

---

[26] As noted in Footnote Seven, throughout his Memorandum in Response to Defendants' Motion for Summary Judgment, Dutton has conflated this Payment of Wages Act claim with his breach of contract claim.  As he has pled two distinct causes of action in his Complaint, the court treats these causes of action separately.

*Corp.,* 463 S.E. 2d 641, 645 (S.C. Ct. App. 1995).  Here, while the court has ruled that only one breach of contract claim survives - Dutton's claim for breach of a contract to provide options in PaperPak - it remains possible that Dutton can establish that he is owed bonuses and equity interests under "employer polic[ies]" or "past practice[s]."[27]  *See Allen v. SunBelt Coca-Cola Bottling, Inc.*, 1999 WL 299243, *2 (S.C. Ct. Com. Pl. 1989).  In short, based on the evidence presently before the court and construing the facts in Dutton's favor, the court denies summary judgment as to Defendant Brown, PaperPak, and New PaperPak on this claim.[28]

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**  Summary judgment is **GRANTED** on Plaintiff's Breach of Contract Claim (Count One) as to all Individual Defendants and to Defendant New PaperPak.  Summary Judgment is **DENIED** as to Plaintiff's claim that Defendant Paper-Pak breached a  contract to provide options.

It is further **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** on Plaintiff's fraud claim (Count Two).

It is further **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to all Individual Defendants and New PaperPak on Plaintiff's Breach of Contract Accompanied by a Fraudulent Act claim (Count Three).  Summary Judgment is **DENIED** as to

---

[27] For example, Dutton could establish that PaperPak routinely paid bonuses of $150,000

[28]  There is no evidence that Fagan or Vande Bossche had any authority with respect to Dutton's pay, and accordingly, the court dismisses this count as to them.  (Dutton Tr. at 197-98; Fagan Tr. at 58-59).  Moreover, Plaintiff does not appear to contend that Myers is liable on this claim.  (Pl. Resp. at 19).  Plaintiff presents no evidence with respect to Myers' actions on any of his claims.

Plaintiff's claim that Defendant Paper-Pak fraudulently breached a contract to provide options.

It is further **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** on Plaintiff's South Carolina Payment of Wages Act claim (Count Four) as to Defendants Fagan, Vande Bossche, and Myers. Defendants' Motion for Summary Judgment is **DENIED** on Count Four as to Defendants Brown, Paper-Pak, and New PaperPak.

It is further **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** on Plaintiff's Wrongful Discharge in Violation of Public Policy claim (Count Five) as to Defendants Fagan and VandeBossche. Summary Judgment is **DENIED** on Count Five as to Defendants Brown, Paper-Pak, and New PaperPak.[29]

                          **AND IT IS SO ORDERED.**

                          **S/ Patrick Michael Duffy**
                          **PATRICK MICHAEL DUFFY**
                          **UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**June 13, 2005**

---

[29] For the sake of clarity, the remaining claims are as follows: (1) breach of contract to provide options in Paper-Pak against Defendant Paper-Pak; (2) breach of contract accompanied by a fraudulent act to provide options in Paper-Pak against Defendant Paper-Pak; (3) wrongful discharge in violation of a clear mandate of public policy/retaliation against Defendants Brown, Paper-Pak, and New Paper-Pak; and (4) violation of the South Carolina Payment of Wages Act against Defendants Brown, Paper-Pak, and New Paper-Pak